1
2
3            **UNITED STATES DISTRICT COURT**
4                  **DISTRICT OF NEVADA**
5   WESLIE MARTIN,                          Case No. 3:22-cv-101-LRH-CLB
6                            Petitioner,
7        v.                                           **ORDER**
8   W.A. GITTERE,[1] *et al.*,
9                            Respondents.

10         This habeas matter is before the Court on the merits of the remaining grounds[2] of Nevada

11   prisoner Weslie Martin's *pro se* federal habeas corpus petition brought under 28 U.S.C. § 2254

12   (ECF No. 6 ("Petition")), Respondents' motion for enlargement of time (ECF No. 41) to comply

13   with the Court's order directing Respondents to submit documents for *in camera* review (ECF No.

14   40), and Martin's request for sanctions (ECF No. 43). In 2019, a Nevada jury convicted Martin of

15   12 charges, arising from crimes that occurred in 2018 at the homes of celebrity Wayne Newton

16   and his neighbor, for which Martin is sentenced to imprisonment for an aggregate of 271 to 768

17   months.[3] (ECF No. 15-34 at 5.) The Petition alleges Martin's federal constitutional rights were

18   violated because (1) the State unlawfully amended the indictment, (2) the state district court failed

19   to replace defense counsel and denied him discovery, (3) there is insufficient evidence to support

20   the convictions, and (4) police unlawfully searched his backpack. For the reasons discussed below,

21

22         [1] According to the state corrections department's inmate locator page, Martin is incarcerated at Ely State
     Prison. The department's website reflects W.A. Gittere is the warden for that facility. *See* Ely State Prison Facility |
23   Nevada Department of Corrections (nv.gov). The Court will therefore direct the Clerk to substitute W.A. Gittere for
     Respondent William Ruebart, under, *inter alia,* Fed. R. Civ. P. 25(d).

24         [2] The remaining grounds of the petition are Grounds 1, 2(a), 3, 4(b) and 5(a). The Court previously dismissed
     as conclusory Grounds 2(b), 2(c), 4(d), and 4(e), and the portions of Grounds 1, 2, and 4 that alleged equal protection
25   violations. (ECF No. 25 at 11.) The Court also determined Grounds 4(a), 4(c), and 5(b) are unexhausted and dismissed
     those grounds upon Martin's request. (ECF Nos. 25 at 11; 26; 27.)
26

27         [3] A jury convicted Martin on 12 counts: (1) two counts of invasion of the home, (2) robbery with the use of
     a deadly weapon, (3) burglary while in possession of a firearm, (4) two counts of burglary, (5) attempted burglary, (6)
28   two counts of grand larceny, (7) grand larceny of a firearm, (8) ownership or possession of a firearm by a prohibited
     person, and (9) cruelty to animals. (ECF No. 15-34 at 2–3.)

the Court will grant Respondents' motion for enlargement of time to comply with the Court's order to submit documents for *in camera* review (ECF No. 41) *nunc pro tunc*, deny Martin's request for sanctions (ECF No. 43), deny the Petition (ECF No. 6), and deny a Certificate of Appealability ("COA").

## I.   BACKGROUND[4]

### A.   Attempted Burglary of Wayne Newton's Neighbor

Anthony Wilham testified he was the property manager for a home, belonging to Gokalp Bayramoglu, near Wayne Newton's residence. (ECF No. 39-16 at 57–58, 78–80.) The home was equipped with an alarm and a camera that, using a motion sensor, turned on a light and recorded activity if anyone went near the back patio door. (*Id.* at 59, 63, 68, 71.) Wilham was on vacation on June 2, 2018, when he received a call from the alarm company. (*Id.* at 64.) He said that "around 11:45 p.m., Vegas time," he remotely accessed video for Bayramoglu's residence and "could see within the past few minutes there was activity on that back patio." (*Id.* at 64, 67–71.) He immediately called 911 and reported there were people on the back patio with "bandanas on and covering the camera and stuff like that," and police responded immediately. (*Id.*) He said the camera "lit up the area," showed "them pretty well" and that "somebody had pushed the camera down trying to manipulate it" and eventually covered the camera. (*Id.* at 71–75.) He forwarded the video to police at "12:20 a.m. on June 3rd." (*Id.* at. 70–71.) Wilham visited the property a couple of days after he returned from vacation and saw "slight damage," i.e., "marks" on the back patio door, but he did not know when those marks occurred, and confirmed there was no evidence anyone gained access inside the home. (*Id.* at 77.) He said the video captured someone standing by the door, but he didn't see anyone mark it up. (*Id.* at 77–78.)

### B.   First Burglary at the Newton Residence

Angela D. Woodring testified she was a housekeeper for Wayne Newton in Las Vegas,

---

[4] The Court here and elsewhere in this order summarizes the relevant state-court record for consideration of the issues. The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state courts. The Court summarizes the same solely as background to the issues presented in this case. No assertion of fact made in describing statements, testimony, or other evidence in the state courts constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked the evidence in considering the claims.

Nevada. (ECF No. 39-16 at 21–22.) She said the Newtons were out of town on the night of June 2, 2018, and she left their residence between 7:00 and 8:00 p.m. (*Id.* at 22–25.) She said the Newtons had 8 or 9 dogs, including two large dogs (Rhodesian Ridgebacks) kept as "kind of" guard dogs, and all of the dogs stayed overnight in a special room on the ground floor, except for three "little white ones" who were free to roam the house. (*Id.* at 31–33.) She returned the following morning around 7:30 or 7:45 a.m., to find a "big hole" in the glass pane for the exterior door to the guest bedroom, so she called 911 and the Newtons. (*Id.* at 23–25, 27–28.)

Carson Wayne Newton testified he, his wife Kathleen, and their daughter, returned home immediately after receiving Woodring's call. (*Id.* at 82–83, 88–89.) He said that, in addition to the damage to the guest room door, the locked door to his master bedroom was kicked-in at six separate places. (*Id.* at 89–92.) He said the towel he kept on his personal safe in his closet so he could tell if it was "messed with by anybody" was also disturbed. (*Id.* at 96.) Wayne said the burglars stole his 22-caliber pistol (kept on a shelf in his closet). (*Id.* at 117–18.) Kathleen testified items taken from the house included: Two iPads, a Louis Vuitton backpack, a Louis Vuitton roller base, a Louis Vuitton duffel bag, a Hermes belt, a Gucci belt, Wayne's Corum bubble watch, another watch belonging to Wayne, some of her bracelets (including a diamond flag bracelet), and her aqua marine ring. (*Id.* at 137–38, 140, 143–50.)

Michael Hansen testified he received a call from the Newtons around 11:00 a.m. on June 3, 2018, reviewed their home surveillance video via remote access, and noticed the cameras detected activity on June 3, 2018, between "5:15, 5:30" and "7:15, 7:20 in the morning." (*Id.* at 36–38.) Hansen said he emailed the video to police, and the video that provided the clearest details came from the camera stationed inside the house at the top of the stairs outside the master bedroom looking down the staircase. (*Id.* at 38–41, 46.)

### C.    Second Burglary at the Newton Residence

Wayne testified that after his show on the night of June 13, 2018, he, Kathleen, and their daughter, returned home, and his daughter immediately went inside the house, let the dogs out of the room off the garage, and took the elevator upstairs to get her puppy out of her bathroom, which was adjacent to the master bedroom, while Wayne and Kathleen stayed outside with the dogs.

(ECF No. 39-16 at 97–99.) He said his daughter "came running out of the house crying and screaming that there was somebody in [his] bathroom." (*Id.* at 100, 152.) Wayne was carrying a firearm and went inside with his daughter, but while they waited for the elevator to take them upstairs, he heard Kathleen outside screaming, so he and his daughter ran back outside. (*Id.*) Hansen testified he provided police with video taken from the camera at the top of the stairs outside the master bedroom for the second break-in, which appeared to depict "two individuals" exit the upstairs bedroom and look "over the railing into the stairwell." (*Id.* at 46–52.)

Kathleen testified that while Wayne and their daughter were inside the house, she waited outside with the dogs, and two men came out of the house "through a side window" outside the front door and ran toward her. (*Id.* at 152.) She said, "there was a taller, thin one, and he had a long silver metal long object that he had up," and a duffel bag, and a "shorter" man holding something in his hand. (*Id.* at 153.) She said that as the taller man "was running out, he had [the long metal object] up in his hand, and as the men "were coming out," her two Rhodesian dogs "ran at them" while barking and went after the men who proceeded to hit the dogs while "backing up." (*Id.* at 153–54, 165–66.) She said the taller man hit the older dog with the long metal object while the shorter man beat the younger dog with the object in his hand until the younger dog went down crying and the shorter man ran away. (*Id.* at 154–55.) She said she screamed "Help, help, shoot him, shoot him," and the taller man ran away, but dropped the duffel bag, returned to retrieve it, and then went over the property wall. (*Id.* at 156.) Kathleen agreed that she told police the burglars had their weapons in the air and her handwritten statement to police did not mention they threatened her with a crowbar or other metal object. (*Id.* at 167–72, 187–89.) On redirect examination, she said the weapons being raised toward her caused her to be fearful. (*Id.* at 184.)

Wayne testified that, when he reached Kathleen, she "was in hysterics and crying," saying "they ran out through the window that they had broke out and when they saw [her], the one guy raised a pipe iron to hit her." (*Id.* at 101.) Wayne said she told him, "'shoot them, shoot them, [t]here they are, there they are,'" and "'[h]e almost hit me with the pipe iron.'" (*Id.*) Wayne "ushered" Kathleen into the car, but she yelled, "'shoot them, shoot them, shoot them,'" so he took "one shot in the air" hoping it would stop them. (*Id.* at 103.)

Las Vegas Metropolitan Police Department ("Metro") police officer Alfred Garcia testified he responded to the scene of the second Newton burglary within 3 minutes of the police dispatch. (ECF No. 39-17 at 81–83, 98–99.) Garcia immediately met Kathleen and Wayne and described Kathleen as "crying, shaking" and said "[s]he was afraid to step out of the car. She was in the car the whole time," and "[s]he was lost for words, she was stumbling over her words." (*Id.* at 87.) Garcia did not recall whether Kathleen said she was threatened with a crowbar and agreed that it would be included in his report if she told him that, but it was not. (*Id.* at 91–92.) According to Garcia's report, Kathleen told him she saw the burglars after the dogs were barking and attacked them. (*Id.* at 94–95.) Metro police detective Ken Krmpotich, who arrived later and was the lead detective for the investigation, testified Kathleen told him "the guy lifted up the crowbar and the dogs attacked" and although she told him the crowbar was "raised," Krmpotich did not recall her saying she was threatened with it. (*Id.* at 191–93, 207, 232, 234.)

Wayne testified the burglars gained entry by throwing a rock at a window next to the front door, which broke some of his antique chairs, and they attempted to open his safe with a tire iron. (ECF No. 39-16 at 106–09, 111–12.) Metro crime scene analyst Tabatha Paine testified she responded to the Newton residence following the second burglary and found a "blue pry bar just on the planter" outside the residence and a large safe in Wayne's closet, "lying on its back" "not standing up," bearing blue paint flakes and tool marks indicating an attempt to "open" "push" or "pull" it. (*Id.* at 114–16.) Kathleen agreed that different drawers were opened during the second robbery than during the first robbery. (*Id.* at 157.) Wayne said the burglars stole two pens (one with an eagle head on top of it and the other with a diamond clasp on the side), and the pens were not recovered. (*Id.* at 117–18.) He said they also stole one of his white shoes, a second Corum bubble watch, loose change, and a bottle of Stefano Ricci cologne, but those items were recovered on the other side of the wall to his property. (*Id.* at 105, 113, 115–18, 122.) Wayne said the taller of the men "knocked out all of the teeth" belonging to his younger Ridgeback dog. (*Id.* at 114.) He said they took the dogs to the veterinarian and the older one was on medication, and they were still not sure whether or not she would survive, and they were trying to decide what to do about the side of the other dog's mouth because she had difficulty eating. (*Id.* at 114–15.)

Officer Garcia testified the radio dispatch said the suspects were Hispanic, that Kathleen's written statement to police described the suspects as "a Hispanic and [B]lack male," and she told him in-person that the suspects were white or Hispanic. (ECF No. 39-17 at 93–99.) Kathleen testified her first thought was the suspects were Hispanic, but told police they might be African American, as their faces were covered with bandannas, and she estimated one was 5' 8" and the other was 5' 11" feet tall. (ECF No. 39-16 at 179–80, 182, 185–86.) Kathleen told police the taller man had a red bandanna, and the shorter man had a black one. (*Id.*)

**D.      Martin sold property stolen from the Newton home during the first burglary.**

Nathanial Ross testified he was employed at Nevada Coin and Jewelry in Las Vegas, Nevada on June 29, 2018. (ECF No. 39-17 at 145, 152.) He said the establishment does not have a pawn license, so it strictly buys and sells "jewelry" "gold coins" "silver," and "bullions." (*Id.* at 146.) He said information about each item the store purchases is entered on LeadsOnline[5] along with the seller's state ID (which is scanned "right into LeadsOnline") and is subject to a 30-day hold to determine whether the item is stolen. (*Id.* at 146–47, 150–51, 154–55.) Ross identified store surveillance video depicting Martin selling items to him (while the video was played for the jury) and a corresponding transaction receipt dated June 29, 2018, in which Martin affirmed the items sold belonged to him or that he had the legal right to sell them for $350. (*Id.* at 152–56, 165–70.) Ross identified a Nevada Coin and Jewelry appraisal for some of the items, which he said is typically done for Metro, which calculated the appraised value for the Reactor stainless steel watch at $1,000; the ring at $1200; the flag [bracelet] at $500; and the Corum watch at $4,000. (*Id.* at 160–64, 172–73.) The Newtons identified the items Martin sold as some of the items stolen during the first burglary of their home. (*Id.* at 252–54.)

**E.      Identification of Martin**

Detective Krmpotich testified he issued a media release containing a still photograph of the taller individual depicted on the video for the attempted burglary at the Bayramoglu residence and received information leading to Martin. (ECF No. 39-17 at 207–09.) Through LeadsOnline, the

---

[5] Ross testified LeadsOnline "is a[n] online metro database for everything that's bought and sold through pawn shops and buy locations" and that participation in the database is legally required. (ECF No. 39-17 at 147.)

detective discovered Martin sold some of the Newtons' property and obtained video of the sale. (*Id.*) Krmpotich testified that, based on his three interactions with Martin,[6] Martin is the man depicted in the still photograph taken from the video of the attempted burglary at the Bayramoglu residence [State's Exhibit 221] and in the store video. (*Id.* at 208–09, 221.) The detective connected Martin to the first Newton burglary by comparing the Newton video with the Bayramoglu video. (*Id.* at 195–200.) He said the video for the first Newton burglary depicted the taller suspect wearing a "black hat, the red shirt, the red, white, and black gloves," "black pants that have the stripes down the side of it about halfway," "[k]ind of like a gym mountain climbing shoe" with a "tag on the back that you put your finger in to pull your shoe on" and a "red bandanna around his face." (*Id.*) He said the Bayramoglu video likewise depicted the taller suspect wearing a red bandanna, "black pants with the stripe halfway down," "the red shirt underneath the hoodie," and the shoes with "the loop on the back." (*Id.*) Krmpotich connected Martin to the second Newton burglary by comparing the Newton videos for both burglaries with the Bayramoglu video. (*Id.* at 201–05.) The detective concluded the taller suspect in the video of the second Newton burglary "was the same body style, same height," and had the "same gait, the way he was walking, the same build," and wore the shoes "with the little loop on the back." (*Id.*) He said, "It was, to me, the same shoe that was in the video of the attempt[ed] burglary and the first burglary." (*Id.*) Krmpotich also said, "the shorter guy, he was the same build, height, as the video of the attempt[ed] burglary." (*Id.*) Krmpotich noted that for each of the Newton burglaries, the taller of the burglars wore shoes "with the loop on the back."[7] (*Id.*) Krmpotich admitted the clothing depicted in the burglary videos was not recovered from Martin's home and police did not find Martin's fingerprints or DNA at the Newton residence. (*Id.* at 226–28.)

Metro patrol officer Kendall Connors testified she learned Martin was a suspect for the burglaries and that he resided two blocks from the Newtons' residence, so she stopped him on July

---

[6] Krmpotich testified to three interactions with Martin, including when he took a buccal swab, and had never interacted with Martin before viewing the burglary videos until he conducted the "pawn check," and determined Martin a suspect. (ECF No. 39-17 at 224–25, 240–41.)

[7] The relevant videos were admitted in evidence and played for the jury; Krmpotich said the videos depicted similar individuals but did not say they depicted the same person. (ECF Nos. 39-16 at 46; 39-17 at 195, 198–99, 204.)

9, 2018. (ECF No. 39-17 at 16–17, 49–51, 55.) She said Martin complied and consented to a search of his backpack where she found a bottle of cologne (depicted on a still photograph from her body camera) and that she released him without arrest. (*Id.* at 50–53, 56.)

Metro Detective Kevin Carey testified he executed a search warrant at Martin's residence on July 14, 2018. (*Id.* at 174, 177–78.) He said police found mail addressed to Martin in a bedroom along with the Newtons' Louis Vuitton luggage, Louis Vuitton backpack, Hermes belt, and Gucci belt. (*Id.* at 181–83, 189.) Police also recovered "two iPads" in another bedroom at Martin's home that matched the description of those taken from the Newton residence but did not find Wayne's pens. (*Id.* at 179–80, 186–87.) Although Krmpotich asked Carey to look for particular clothing, including pants depicted in the videos for both burglaries, they were not found in Martin's residence. (*Id.* at 188–91.) Based on personal contact with Martin, Carey identified Martin as the man depicted in the Bayramoglu video. (*Id.* at 175–76.)

Detective Krmpotich testified police discovered Wayne's missing .22 caliber firearm at the residence of Matthew Denton. (*Id.* at 221–22, 238.) He said Denton is 5' 5" tall, weighs 140 to 150 pounds, and has a unique gait or move to his step caused by an automobile accident, which eliminated him as one of the burglars depicted in the surveillance videos. (*Id.* at 222–24.) Denton told Krmpotich he bought the firearm from a Hispanic man in a parking lot, but the man was not located. (*Id.* at 223–24.) The defense called Denton to testify but Denton invoked his Fifth Amendment privilege. (*Id.* at 78–80.)

Ten-year-old G.B. testified he knew Martin and he heard Martin say he robbed "Mr. Las Vegas," which G.B. later learned from the internet was Wayne's nickname. (*Id.* at 264–67.) G.B. said Martin showed him Louis Vuitton bags (one that hangs on a shoulder and another that is a suitcase) and a gray revolver, and said he stole them from Mr. Las Vegas. (*Id.* at 267–69.) G.B. did not remember whether the gun handle was black, but agreed it was dark. (*Id.* at 275–76.)

## II.   LEGAL STANDARDS

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal standards for consideration of the Petition:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10, 412) (internal citation omitted).

The Supreme Court has instructed that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands state-court decisions be given the benefit of the

doubt.") (internal quotation marks and citations omitted). A state court is not required to cite Supreme Court cases or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 357 U.S. 3, 8 (2002). The petitioner carries the burden of proof. *See Pinholster*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)). Where the state court has denied a federal constitutional claim on the merits without explanation, this Court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision" and then considers, "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Richter*, 562 U.S. at 102.

Where there is no clearly established federal law, i.e., no holding from the Supreme Court, stating a particular standard or rule at the time of the state court decision, then, by definition, a petitioner cannot establish under AEDPA that the state court's decision was either contrary to or an unreasonable application of clearly established federal law. *See, e.g., Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see also Williams,* 529 U.S. at 412 (interpreting "the meaning of the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States'" contained in 28 U.S.C. § 2254(d)(1) as referring to "the holdings, as opposed to the *dicta*, of the [Supreme] Court's decisions as of the time of the relevant state-court decision.") (emphasis in original).

## III. DISCUSSION

### A. Ground 1—Amendment of the Indictment

Ground 1 alleges the amendment of the indictment violated Martin's rights to due process, a fair trial, and equal protection, under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 6 at 3.) Martin claims the grand jury returned a true bill for 9 charges, not the 12 for which he was convicted, and the State failed to file the proposed indictment. *Id.* Respondents contend the grand jury returned a true bill for all 12 charges and the State was not required to file a proposed indictment. (ECF No. 39-25 at 17–18.)

The Supreme Court of Nevada rejected these claims on plain error review:

1
2
3
4
5

> Martin raises a number of issues for the first time on appeal. We review "all unpreserved errors . . . for plain error without regard to as to whether they are of constitutional dimension." *Martinorellan v. State*, 131 Nev. 43, 48, 343 P.3d 590, 593 (2015). Under plain error review, the "appellant must demonstrate that: (1) there was an error; (2) the error is plain, meaning that it is clear under current law from a casual inspection of the record; and (3) the error affected the defendant's substantial rights." *Jeremias v. State*, 134 Nev. 46, 50, 412 P.3d 43, 48 (2018) (internal quotation marks omitted). Specifically, Martin argues . . . the indictment was improperly broadened and later amended. Martin has not shown . . . [this] . . . constituted plain error under current law and therefore we reject his contentions.

6   (ECF No. 17-13 at 15 n.10.)

7   "A person's right to reasonable notice of a charge against him, and an opportunity to be

8   heard in his defense—a right to his day in court—are basic in our system of jurisprudence . . . ."

9   *In re Oliver*, 333 U.S. 257, 273 (1948) (footnote omitted); *see also Cole v. Arkansas,* 333 U.S.

10  196, 201 (1948) ("No principle of procedural due process is more clearly established than that

11  notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge,

12  if desired, are among the constitutional rights of every accused in a criminal proceeding in all

13  courts, state or federal."); *Gautt v. Lewis*, 489 F.3d 993, 1003–05 (9th Cir. 2007) (recognizing, for

14  purposes of AEDPA, "it is 'clearly established' that a criminal defendant has a right, guaranteed

15  by the Sixth Amendment, and applied against the states through the Fourteenth Amendment, to be

16  informed of any charges against him, and that a charging document, such as an information, is the

17  means by which such notice is provided."). In Nevada, a state district court "may permit an

18  indictment or information to be amended at any time before verdict or finding if no additional or

19  different offense is charged and if substantial rights of the defendant are not prejudiced." NRS §

20  173.095; *Green v. State,* 94 Nev. 176, 177, 576 P.2d 1123, 1123 (1978).

21  The Supreme Court of Nevada's treatment of these claims is objectively reasonable as the

22  state court's record belies Martin's assertions that the grand jury only indicted him for 9 charges.

23  The initial indictment, signed by the grand jury foreperson, and filed the day after the grand jury

24  entertained testimony and evidence, authorized a true bill on behalf of the grand jury for 12 charges

25  against Martin: (1) two counts of invasion of the home; (2) two counts of grand larceny; (3) two

26  counts of burglary; (4) burglary while in possession of a firearm; (5) grand larceny of a firearm;

27  (6) ownership or possession of firearm by a prohibited person; (7) attempted burglary; (8) robbery

28  with use of a deadly weapon; and (9) cruelty to animals. (ECF No. 39-2.)

At defense request, the parties informed the trial court on the morning of jury selection that the State would file an amended charging document so that the charge for ownership or possession of a firearm by a prohibited person could be presented in a trial bifurcated from the trial on the other 11 charges. (ECF Nos. 15-10; 15-14 at 3.) The State thereafter filed an amended indictment alleging 11 of the counts alleged in the initial indictment and temporarily omitting the charge alleging ownership or possession of a firearm by a prohibited person. (*Compare* ECF Nos. 15-12; 15-18; 15-24; 39-2) The defense did not object to the State later filing a second-amended indictment to correct typographical errors and the second-amended indictment included the same 11 charges that were alleged in the amended indictment. (ECF Nos. 15-18; 39-17 at 6.) After the jury returned verdicts convicting Martin for all 11 charges in the second-amended indictment, the State filed a third-amended indictment that added the charge for ownership or possession of a firearm by a prohibited person, a trial was held on that single additional charge, and the jury convicted Martin for that charge. (*See* ECF Nos. 39-2; 15-12, 15-18, 15-24; 15-27; 15-28.) Thus, based on the state court's record, it is objectively reasonable to conclude that, as a matter of federal constitutional law, Martin received adequate notice of the charges by virtue of the grand jury's initial indictment and the State did not unlawfully amend the indictment. Moreover, Martin fails to cite any Supreme Court authority that requires the State to file a proposed indictment before grand jury proceedings. The Supreme Court of Nevada's determination is neither contrary to nor constitutes an unreasonable application of clearly established Federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. For these reasons, Martin is not entitled to federal habeas corpus relief for Ground 1.

## B.     Ground 2—Concession Strategy[8]

In the remaining allegations in Ground 2 of the Petition, Martin alleges he was unconstitutionally presented with the option of representing himself or proceeding with incompetent counsel due to a conflict with counsel and that trial counsel was ineffective because

---

[8] The Court subdivides Ground 2 for clarity.

counsel used vulgar language, conceded guilt at trial, failed to preserve several grounds for appeal, and failed to raise grounds against his wishes, in violation of the Sixth and Fourteenth Amendments. (ECF No. 6 at 5.) He moreover alleges the state supreme court erroneously concluded he failed to raise a substantive *McCoy*[9] claim in his direct appeal and that he preserved an ineffective assistance of appellate counsel claim in his postconviction proceedings. (*Id.*) Respondents contend the trial court did not err in declining to appoint new trial counsel because Martin had no right to a meaningful relationship with counsel, a disagreement over trial strategy is not an actual conflict, counsel did not concede Martin's guilt at trial, the state district court adequately inquired into the nature of the conflict, and the motion to appoint new trial counsel was untimely as it was presented six days before trial. (ECF No. 39-25 at 18–23.)

### 1.    Additional Background

Martin verbally moved for the appointment of new trial counsel claiming a conflict of interest. (ECF No. 15-9 at 4.) During an *ex parte* hearing, Martin explained the conflict arose over fallout from a difference of opinion over trial strategy and trial counsel eventually disclosed that Martin did not want counsel to concede some of the charges as a defense strategy. The state district court first conducted an inquiry into the conflict from Martin's perspective:

THE COURT: Mr. Martin, okay, what's your issue with your attorneys?

. . . .

THE DEFENDANT: [Defense counsel] came to see me Friday. We were discussing I guess possible trial defenses, I would say, and um, we couldn't see eye to eye on what I wanted versus what he wanted, you, know, so therefore I seem to have a conflict of interest. That led to a full blown—[brief pause] that led to a full-blown, I want to say, argument, heated discussion where he began to use vulgar language with me and I had to walk out of the session, of the meeting we were having because he stood up. And you know what I'm saying, I honestly felt threatened. So, therefore I wanted to move myself away from the situation literally because I wanted something different and they—these two gentlemen feel like it should go a whole 'nother way and I should just basically do what they want me to do and that's not what I want to do. So, I asked them to remove themselves off of my case, or whatever needs to be done, because we're not seeing eye to eye and I really do not feel comfortable going to trial with these gentlemen at all, period, or anyone else from the Public Defender's Office . . . .

THE COURT: And so, you disagree with the trial strategy that these two gentlemen—

---

[9] *McCoy v. Louisiana*, 138 S. Ct. 1500, 1505 (2018).

13

THE DEFENDANT: I disagree with—

THE COURT: —discussed?

THE DEFENDANT: —everything—

THE COURT: Okay.

THE DEFENDANT: —with everything that they're going—the entire way they're going. I want to go a different way—

THE COURT: Okay.

THE DEFENDANT: —and they don't want to do that.

THE COURT: But they're the trained and licensed attorneys and I would venture to guess we have about 50 years' experience at that table, probably more, 50 years' experience at that table.

THE DEFENDANT: I understand that, Your Honor, and I'm not taking that away from anyone. You know I respect that. But once things go off—once things get heated and they fly off the handle and a guy, like you just said, has that much experience, loses his temper and begins to curse me out and stands up and to the point where I feel like I have to remove myself from the situation because me being an inmate I'm—I've been coming back and forth to prison since I was 19 years old so I have a specific mindset and that's not to take disrespect from anyone so therefore I did what I felt was the right thing to do by removing myself from the situation before anything could lead on further. So, therefore I really don't feel like anything between me and these gentlemen could ever possibly co-exist.

(ECF No. 15-8 at 3–6.) Co-counsel, without disclosing the nature of the strategy or conflict, explained there was a difference over trial strategy and assured the court it could be resolved. (*Id.* at 6–9.) Lead counsel, without disclosing the nature of the strategy or conflict, informed the court he took offense that, in response to counsel's trial strategy, Martin stated counsel appeared to be working for the State, but that counsel would like to remain on the case. (*Id.* at 9–10.) The court entertained Martin's explanation of additional details about the conflict, but Martin again did not disclose the nature of the strategy or conflict, and the court offered Martin two alternatives: Go to trial with the attorneys the following week as planned or represent himself:

THE DEFENDANT: Okay. Basically, his exact words to me were, um,—when I brought up a certain situation that I wanted to do this way when they wanted to do it another way, I said, no I want to do it this way. And his exact words were, well don't just sit there and say nothing. Don't talk out the side of your ass. Tell me what the f`k you mean. And then that's when everything just stopped right there, you know what I'm saying? So, I don't feel like anything can be rectified with these two gentlemen. I don't want anything to do with them. Honestly, if you put them on my case and we go to trial I won't discuss anything with them.

. . . .

THE COURT: All right, sir, you don't have to agree with their trial strategy. They are the experienced attorneys. They decide on the trial strategy. They can confer with you, but they know the law. They know what will work in front of me. They know what arguments I might buy. They know what arguments and presentation that a jury could be persuaded by and that's because they're experienced attorneys. They don't have to agree with your trial strategy; okay? And so, I don't see there's any reason to remove them.

Now, whether you decide to dig your heels in and not talk to them during the trial or from now until we start on Monday, that's up to you and that's to your disadvantage.

(*Id.* at 11.) Martin initially stated he preferred to proceed "*pro se*" but subsequently changed his mind, stating if he couldn't "have any other counsel," then he was "forced to be with these two gentlemen" he did not "feel comfortable with" as the court left him with "no other option." (*Id.* at 11–12.) The court stated, "well there is an option, you stay with these attorneys because they are experienced . . . ." and that the court didn't "see any legal or factual basis for them to be removed" from the case. (*Id.* at 12–13.) The court declined to explain its decision and asked Martin if he wished to represent himself in the case and Martin replied, "I can't. I'm not a lawyer." (*Id.*)

At that point defense counsel disclosed to the court that the reason for the conflict was that counsel's trial strategy was to "concede some counts." (*Id.* at 15.) Counsel asked the court for a 30-day trial continuance to "fix this relationship" because Martin must "agree with that or we can't do it." (*Id.*) The state district court replied, "then don't" and stated it would not discuss a continuance outside the presence of the State. (*Id.* at 15–16.) In the presence of the prosecutor, co-counsel asked for the continuance to "have an opportunity to solve the personality conflict that created itself on Friday . . . ." (ECF No. 15-9 at 7.) The prosecutor opposed the continuance, and the court denied the request. (*Id.* at 7–8.)

In opening statements to the jury, defense counsel conceded Martin "is not innocent of all wrongdoings here" and was "willing to take responsibility for the things he's done and the consequences of that," and argued Martin was a "scapegoat" for the wrongdoing of others. (ECF No. 39-16 at 15–16.) Counsel argued Martin was captured on camera for the attempted burglary charge, but the evidence would fail to show any physical attempts to enter that home. (*Id.* at 16–

17.) Counsel argued Martin attempted to sell items taken during the first burglary of the Newton home, but police found Newton's stolen firearm in Denton's possession. (*Id.* at 15, 18.)

In closing remarks defense counsel conceded the video from the Bayramoglu residence and the jewelry store each depicted Martin, and Martin had possessed property taken during the first Newton burglary but argued the individuals who committed the first and second burglaries are not the same, and Martin "was not involved" in and did not commit the second burglary and did not steal Wayne's firearm or pens. (ECF No. 39-18 at 40, 43–44, 50, 52.) Counsel argued that although Martin was videotaped covering the camera at Bayramoglu's backdoor, there was no evidence he attempted to burglarize that house. (*Id.* at 56.) Counsel argued the State failed to prove Martin perpetrated the first Newton burglary because his face was not on the Newton video. (*Id.*) In conclusion, counsel argued Martin should not be convicted for the second burglary and urged the jury to conclude Martin "didn't take that firearm" and not to "convict him of crimes he didn't commit." (*Id.* at 59.)

### 2.    Legal Principles

"The Sixth Amendment right to counsel includes the 'correlative right to representation that is free from conflicts of interest.'" *Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). "Upon notification that an actual or potential conflict of interest exists, a trial court has the obligation 'either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel.'" *Id.* (quoting *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978) and *Wood*, 450 U.S. at 272 n.18). "If the trial court fails to undertake either of these duties, the defendant's Sixth Amendment rights are violated." *Id.* (citing *Holloway,* 435 U.S. at 484.) "Even if a defendant's Sixth Amendment rights have been violated in this manner, though, the defendant cannot obtain relief unless he can demonstrate that his attorney's performance was 'adversely affected' by the conflict of interest." *Id.* (quoting *Mickens v. Taylor*, 535 U.S. 162, 174 (2002) (holding "[W]e think 'an actual conflict of interest' meant precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." (quoting *Sullivan*, 446 U.S. at 349–50 (emphasis in original))) (footnote omitted). With respect to a breakdown in the attorney-

client relationship, the Supreme Court has rejected "the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel." *See Morris v. Slappy*, 461 U.S. 1, 14 (1983); *see also United States v. Chronic*, 466 U.S. 648, 657 n.21 (1984) (declining to attach any weight to the expression of satisfaction with counsel's performance at the time of trial or a later expression of dissatisfaction by noting "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer," and affirming that "[i]f counsel is a reasonably effective advocate, he meets the constitutional standards irrespective of his client's evaluation of his performance."); *Wheat v. U.S.*, 486 U.S. 153, 159 (1988) (explaining "[t]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.").

The Ninth Circuit Court of Appeals has established a test for assessing an "irreconcilable conflict" between a defendant and counsel for determining whether substitution of counsel is warranted in instances where conflicts arise due to the breakdown between a defendant and counsel. *See United States v. Moore*, 159 F.3d 1154, 1158–59 (9th Cir. 1998) (holding consideration whether a court properly denied a request for substitution of counsel based on an irreconcilable conflict is based on "(1) the extent of the conflict; (2) the adequacy of the inquiry [by the trial court]; and (3) the timeliness of the motion [for substitution of counsel]."); *see also Young v. State*, 120 Nev. 963, 965–69, 102 P.3d 572, 574–76 (2004) (adopting *Moore*'s three-part test). The Supreme Court has never endorsed the Ninth Circuit's irreconcilable conflict precedent. *See Carter v. Davis*, 946 F.3d 489, 508 (9th Cir. 2019); *see also Parker v. Matthews*, 567 U.S. 37, 49 (2012) (holding the Sixth Circuit erred in applying its circuit's "multistep test" that bore scant resemblance to the general rules announced by the Supreme Court).

The Supreme Court has held that under the Sixth Amendment, "it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." *McCoy,* 138 S. Ct. at 1505. In *McCoy*, defense counsel for a capital murder trial reasonably believed the objective of his representation was avoidance of the

death penalty and planned to concede McCoy killed three people while arguing McCoy lacked specific intent to kill them as required for murder; however, McCoy testified at trial and had insistently maintained his innocence and objected to counsel's strategy. *Id.* at 1506–08, n.1. The Supreme Court held that "once McCoy communicated that to court and counsel, by strenuously objecting to counsel's proposed strategy, a concession of guilt should have been off the table" and the "trial court's allowance of defense counsel's admission of McCoy's guilt despite McCoy's insistent objections was incompatible with the Sixth Amendment." *Id.* at 1512. The Court held the trial court's "error was structural" and required a new trial. *Id.*

### 3.    State Supreme Court's Determinations

On direct appeal, the Supreme Court of Nevada determined Martin and his counsel did not have an actual conflict of interest over counsel's concession strategy under the *Moore/Young* test, and concluded Martin had not raised a substantive *McCoy* claim:

> We review the denial of a motion to substitute counsel for abuse of discretion. *Anderson v. State*, 135 Nev. 417, 424, 453 P.3d 380, 386 (2019). When considering whether the district court abused its discretion in denying a motion for substitution of counsel, we consider (1) the extent of the conflict, (2) the adequacy of the inquiry, and (3) the timeliness of the motion. *Young v. State*, 120 Nev. 963, 965, 102 P.3d 572, 574 (2004). We consider each factor in turn.
>
> First, we evaluate the extent of the conflict. "A defendant is not entitled to reject his court-appointed counsel and request substitution of other counsel at public expense absent a showing of adequate cause for such a change." *Gallego v. State*, 117 Nev. 348, 362, 23 P.3d 227, 237 (2001) (internal quotation marks omitted), *abrogated on other grounds by Nunnery v. State*, 127 Nev. 749, 263 P.3d 235 (2011). Further, a defendant cannot establish that a conflict is irreconcilable simply because he refuses to cooperate with appointed counsel. *Id.* at 363, 23 P.3d at 237. Here, the conflict turned on a dispute regarding whether to concede guilt at trial.
>
> > [FN 6] We considered the other instances of attorney-client conflict Martin points to, but determine they have minimal bearing on determining the extent of the conflict because they were resolved by the district court in other hearings. Thus, those conflicts informed our analysis but only with respect to the relationship between Martin and his counsel generally.
>
> The district court told Martin and his counsel the decision whether to concede guilt was Martin's alone to make.
>
> > [FN 7] Martin does not raise, nor do we consider, whether his counsel's desire to concede guilt violated his Sixth Amendment rights under *McCoy v. Louisiana*, ___ U.S. ___, 138 S. Ct. 1500 (2018). We consider the issue of whether to concede guilt only as it relates to the extent-of-the-conflict factor as part of *Young*'s three-

18

factor analysis for evaluating a district court's denial of substitute counsel.

Although there was a disagreement, there was not actually a true conflict because Martin had the final say regarding whether to concede guilt. Thus, Martin has not demonstrated an adequate cause for the change in counsel and any conflict that he perceived was minor.

Second, the district court adequately inquired into Martin's request for substitute counsel because on three separate occasions it provided Martin an opportunity to raise issues he was experiencing. On each occasion, the district court gave Martin an opportunity to speak and inquired into the extent of the conflict.

[FN 8] Martin argues that the district court's inquiries were inadequate because it did not ask him pointed questions regarding the perceived conflict. We reject this argument in light of the numerous opportunities the district court provided Martin to raise concerns. Nor does Martin identify any particular question that he believes the district court should have asked.

Thus, the district court's inquiry was adequate.

Third, Martin's motion for substitute counsel was not timely as it was raised during calendar call on June 11, 2019, with the trial scheduled to begin June 17. Martin argues that the district court's inquiries were inadequate because it did not ask him pointed questions regarding the perceived conflict. We reject this argument in light of the numerous opportunities the district court provided Martin to raise his concerns. Nor does Martin identify any particular question that he believes the district court should have asked.

Based on the foregoing, we conclude the district court did not abuse its discretion by denying Martin's motion for substitute counsel.

(ECF No. 17-13 at 10–11.)

### 4.    Disposition of Ground 2(a)(1)

The Supreme Court of Nevada concluded reasonably that the conflict over counsel's concession strategy was resolved once the state district court instructed defense counsel not to concede Martin's guilt without Martin's consent as Martin did not object to counsel's concessions during opening and closing remarks or at any time throughout the multi-day trial. Moreover, based on the record, it is objectively reasonable to conclude the state district court took adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel. The state district court provided Martin and his counsel multiple opportunities to provide a basis, if any, for an actual conflict of interest, until the source of the conflict was finally revealed, at which point, the court promptly resolved it. The Supreme Court of Nevada moreover reasonably declined to consider whether the trial court violated *McCoy* based on trial counsel's desire to concede guilt

because Martin did not raise a substantive *McCoy* claim in his appeal to that court. Instead, in his state-court appeal, Martin claimed the state district court erred by failing to make an adequate inquiry in deciding whether to substitute counsel due to a complete collapse in the attorney-client relationship under the *Moore/Young* test. (ECF No. 16-38 at 30, 39–52.) As stated above, the Supreme Court has not endorsed the Ninth Circuit's test in *Moore* for purposes of determining whether an irreconcilable conflict between a defendant and trial counsel requires substitution of counsel under the Sixth Amendment, and the Supreme Court has never held that a defendant has the right to a meaningful relationship with trial counsel. For these reasons, the Supreme Court of Nevada's determinations are neither contrary to nor constitute unreasonable applications of clearly established Federal law as determined by the Supreme Court and are not based on unreasonable determinations of the facts in light of the evidence presented in the state-court proceedings.[10]

### 5.    Disposition of Ground 2(a)(2)

Ground 2 of the Petition also alleges ineffective assistance of trial counsel for using "vulgar language," conceding guilt at trial, failing to preserve issues for appeal, and failing to raise grounds against Martin's wishes. (ECF No. 6 at 5.)

On May 22, 2020, while Martin's direct appeal was pending before the Supreme Court of Nevada, Martin filed an initial *pro per* state postconviction review petition alleging, among other things, that trial counsel was ineffective because counsel "admitted to charges which prejudiced [Martin] in front of the jury." (ECF No. 15-48 at 7.) The state district court disregarded that initial petition because Martin chose to proceed with his direct appeal. (ECF No. 16-25 at 3.) On November 30, 2021, the Supreme Court of Nevada affirmed Martin's convictions and, following denials of requests for rehearing, issued a remittitur on August 16, 2021. (ECF Nos. 17-3; 17-21.)

---

[10] Martin relies on *Crandell v. Bunnell*, 25 F.3d 754, 755 (9th Cir. 1994), which held that, under the circumstances presented in that case, Crandell could not have been forced to choose between incompetent counsel and no counsel at all. (ECF No. 6 at 5.) *Crandell* has no application to Martin's case as the state-court record demonstrates Martin's dispute with counsel was due to their differences of opinion whether Martin should concede some of the charges, not counsel's competence.

Martin also makes an unspecified claim that his Ninth Amendment rights were violated (ECF No. 6 at 5), however, conclusory allegations of violations of federal rights without specifics do not state a basis for habeas corpus relief. *Mayle v. Felix*, 545 U.S. 644, 649 (2005); *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995).

Martin filed a second state postconviction review petition on December 15, 2021, claiming, *inter alia*, that trial counsel was ineffective because counsel "conceded guilt at trial against petitioner's will." (ECF No. 39-23 at 6–7.) The state district court dismissed the petition with prejudice as procedurally barred under NRS § 34.810(1) because all of the claims raised in the second petition were addressed in the Supreme Court of Nevada's order affirming the judgment on direct appeal. (ECF No. 17-22 at 3.) Martin did not appeal the denial of the December 2021 petition. Martin's claims in Ground 2 against trial counsel are thus unexhausted and procedurally defaulted.[11] Martin has not offered any reason to excuse his failure to exhaust his federal habeas claims in state court. The Court will review the record *sua sponte* to determine whether cause exists to excuse the default under *Martinez v. Ryan*, 566 U.S. 1 (2012). See *Bodie v. Ryan*, No. CV-12-02269-PHX-FJM, 2014 WL 2135992, at 8 (D. Ariz. May 22, 2014). For the reasons that follow, the Court concludes it does not.

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted). "A petitioner satisfies the exhaustion requirement by fully and fairly presenting each claim to the highest state court." *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009). "The presentation of a claim in a procedural context in which the merits will not be considered, or will be considered only in special circumstances, does not constitute fair presentation of the claim." *See, e.g., Castille v. Peoples*, 489 U.S. 346, 351–52 (1989).

Here, Martin would face multiple procedural bars if he were to return to the state courts with the exhausted claims of ineffective assistance of trial counsel. *See, e.g.*, NRS §§ 34.726; 34.810. Where a petitioner has failed to present his claims in state court in accordance with state procedures, he "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," federal habeas review "is barred unless the prisoner can

---

[11] Respondents mistakenly submitted as an exhibit an affirmance order (ECF No. 17-9) for a different case.

demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1727 (2022); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To demonstrate cause for a procedural default, a petitioner "must establish that some external and objective factor impeded his efforts to comply with the state's procedural rule." *Hiivala v. Wood*, 195 F.3d 1098, 1105 (9th Cir. 1999) (citing *Murray v. Carrier,* 477 U.S. 478, 488, (1986)). "[T]o establish prejudice, [a petitioner] must show not merely a substantial federal claim, such that 'the errors . . . at trial created a possibility of prejudice,' but rather that the constitutional violation 'worked to his actual and substantial disadvantage.'" *Shinn*, 142 S. Ct. at 1734–35 (citing *Carrier*, 477 U.S. at 494 and quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphasis in original).

The Supreme Court has carved out an exception to the general requirements for cause and prejudice that permits a petitioner to overcome a procedural default for an ineffective assistance of trial counsel claim:

> [W]here (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14, 18 (2012) and relying on *Coleman*, 501 U.S. 722).[12] An ineffective-assistance-of-trial-counsel claim "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14–16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). In *Martinez*, the Supreme Court cited the standard for issuing a certificate of appealability as an analogous standard for determining whether a claim is substantial. *Id.* According to the certificate of appealability standard, a claim is substantial if a petitioner shows "reasonable jurists could debate whether . . . the [issue] should

---

[12] Nevada prisoners must raise IAC claims for the first time in an initial state petition for postconviction review, which is considered the initial collateral review proceeding. *See Rodney v. Filson,* 916 F.3d 1254, 1259–60 (9th Cir. 2019).

have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. This standard does not require a showing that the claim will succeed, but instead only that its proper disposition could be debated among reasonable jurists. *See generally Miller-El*, 537 U.S. at 336–38.

The record fails to support a finding that Martin can establish a substantial claim of prejudice under *Strickland* for purposes of overcoming the procedural default of his ineffective assistance of trial counsel claims. The state district court instructed Martin's counsel not to pursue a trial strategy that included concession of guilt without Martin's consent. Nothing in the record shows trial counsel's concession strategy was presented without his consent. Martin did not object to the strategy after the trial court instructed counsel not to undertake the concession strategy without Martin's consent as Martin did not object to counsel's concessions during opening and closing statements or throughout the trial. In light of the sufficiency of the evidence for all counts of conviction, *see infra* at pp. 24–35, Martin fails to demonstrate there is any reasonable probability the result of the proceedings would have been different had counsel refrained from conceding some of the counts. Martin has moreover failed to establish the result of the proceedings would have been different had counsel not used vulgar language during their discussions about the strategy. Finally, Martin's allegations that trial counsel failed to preserve grounds for appeal and failed to raise grounds against his wishes lack specificity, rendering them conclusory. For the foregoing reasons, Martin's claim of ineffective assistance of trial counsel, raised in Ground 2(a)(2), will be dismissed as procedurally defaulted.

### 6.    Disposition of Ground 2(a)(3)

Ground 2 of the Petition asserts the Supreme Court of Nevada erroneously concluded Martin failed to raise a substantive *McCoy* claim in his direct appeal, that he "argued *McCoy v. Louisiana* due to counsel conceding guilt against his wishes at trial . . . ." and that he preserved a claim in his May 20, 2020, state postconviction petition for writ of habeas corpus that his appellate counsel was "incompetent and ineffective." (ECF No. 6 at 5.) The Court will construe these allegations as constituting a claim that appellate counsel was ineffective in failing to raise a substantive *McCoy* claim. *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) ("Prisoner *pro se*

pleadings are given the benefit of liberal construction.") (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)) ("A document filed *pro se* is 'to be liberally construed.'"). As Martin's state postconviction review petition does not allege ineffective assistance of appellate counsel for failing to raise a *McCoy* claim, the claim is unexhausted and, for the reasons discussed in Ground 2(a)(2), the claim is procedurally defaulted.

The Constitution guarantees a defendant effective appellate counsel, just as it guarantees a defendant an effective trial counsel. *Evitts v. Lucey,* 469 U.S. 387, 396 (1985). However, federal habeas court may not entertain a procedural defaulted claim of ineffective assistance of appellate counsel without meeting the cause and prejudice requirements. *Davila v. Davis*, 582 U.S. 521, 137 S. Ct. 2058, 2065–66 (2017) (expressly declining to extend *Martinez* to allow federal courts to hear substantial, but procedurally defaulted, claims of ineffective assistance of appellate counsel when a prisoner's state post-conviction counsel provides ineffective assistance by failing to raise that claim).

For the reasons discussed in Ground 2(a)(2), the record belies a finding that Martin can establish actual prejudice sufficient to overcome the procedural default of his claim of ineffective assistance of appellate counsel for failing to raise a substantive *McCoy* claim as the record shows there is no reasonable probability the result of the direct appeal would have been different had a standalone *McCoy* claim been raised during Martin's direct appeal. "[F]ailure to raise a meritless argument does not constitute ineffective assistance." *Martinez v. Ryan*, 926 F.3d 1215, 1226 (9th Cir. 2019) (quoting *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985)). For the foregoing reasons, Martin's claim of ineffective assistance of appellate counsel for failing to raise a substantive *McCoy* claim, raised in Ground 2(a)(3) will be dismissed as procedurally defaulted.

## C.    Ground 3—Sufficiency of the Evidence[13]

Ground 3 alleges there is insufficient evidence, in violation of Martin's rights to a fair trial under the Sixth and Fourteenth Amendments, to support his convictions for (a) robbery of Kathleen with a deadly weapon; (b) cruelty to animals; (c) ownership or possession of a firearm by a

---

[13] The Court subdivides Ground 3 for clarity.

prohibited person; (d) burglary of Nevada Coin and Jewelry; and (e) attempted burglary of the Bayramoglu residence. (ECF No. 6 at 7–8.) Martin additionally challenges the sufficiency of the evidence to support an aiding and abetting theory of liability for all 12 of his convictions.[14] (*Id.*)

### 1.      Legal Principles

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)). A jury verdict must stand if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could find the essential elements of the offense beyond a reasonable doubt." *Id.* at 319 (emphasis in original). The *Jackson* standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 324 n.16). A federal habeas petitioner faces a "considerable hurdle" when challenging the sufficiency of evidence to support his conviction. *Id.* A reviewing court, "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any conflicts in favor of the prosecution and must defer to that resolution." *Id.* (quoting *Jackson*, 443 U.S. at 326). Where circumstantial evidence is used to establish guilt, the Supreme Court has held that it is "intrinsically no different from testimonial evidence" because although "circumstantial evidence may in some cases point to a wholly incorrect result" this is "equally true of testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954) (rejecting contention that circumstantial evidence must exclude every hypothesis but that of guilt). "In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the

---

[14] Respondents contend Martin failed to identify which specific convictions he challenges, nor does he indicate for which specific elements of the crimes the prosecution did not present sufficient evidence. (ECF No. 39-25 at 25.) The Petition, however, specifically refers to "all ground[s] exact same raised on direct appeal and habeas corpus" and alleges facts in support of his claims of insufficiency of evidence. (ECF No. 6 at 7–8.) As stated earlier, "[p]risoner *pro se* pleadings are given the benefit of liberal construction." *See supra* at pp. 23–24. The Court therefore construes Martin's allegations in Ground 3 as challenging the sufficiency of the evidence for the convictions he challenged in his direct appeal and state habeas corpus proceedings. *See infra* at pp. 26–27.

jury is convinced beyond a reasonable doubt, we can require no more." *Id; see also Jackson*, 443 U.S. at 324–25 (finding circumstantial evidence sufficient to prove specific intent to kill).

### 2.  State Supreme Court Determinations

The Supreme Court of Nevada determined the State presented sufficient evidence that Martin directly committed each of the offenses for which he was convicted:

> Martin challenges the sufficiency of the evidence for his convictions of (1) robbery with the use of a deadly weapon, (2) cruelty to animals, (3) ownership or possession of a firearm by a prohibited person, (4) burglary of Nevada Coin and Jewelry, and (5) attempted burglary. Additionally; [sic] he challenges the sufficiency of the evidence for all of his convictions on the theory that there was insufficient evidence of aiding or abetting.

> When reviewing a sufficiency of evidence challenge, this court considers "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (internal quotation marks omitted).

> *Robbery with the use of a deadly weapon*

> During the robbery of the Newton residence on June 13, 2018, Martin took two pens belonging to Mr. Newton from the bedroom he shares with Mrs. Newton. While fleeing, Martin was confronted by Mrs. Newton and was attacked by the family's dogs, which he fended off with a large metal object before ultimately being able to escape. Martin was charged and convicted of robbing Mrs. Newton with the use of a deadly weapon stemming from this event.

>> [FN 1] We reviewed the sufficiency of the evidence claim for the robbery conviction only against Mrs. Newton. As pointed out by Martin, the amended indictment improperly listed two other potential victims in violation of a pretrial ruling. However, because we find there was sufficient evidence that Martin robbed Mrs. Newton we conclude the error was harmless.

> The elements of robbery are the unlawful (1) taking, (2) of another person's personal property, (3) from the person or in the person's presence, (4) against their will, (5) by means of force or violence or creation of fear of injury. NRS 200.380(1).

>> [FN 2] We reviewed this case under the 1995 version of the statute because it was the version in effect at the time Martin committed the robbery. *See* 1995 Nev. Stat., ch. 443, § 60, at 1187–88.

> The penalty for robbery may be enhanced when a firearm or other deadly weapon is used during the commission of the crime. NRS 193.165(1). Martin argues the State did not prove elements two, three, and five, or that a deadly weapon was used in the course of the robbery. We disagree.

> First, with respect to the second element, the possessory interest requirement, "the State must show that the victim had possession of or a possessory interest in the property taken." *Valentine v. State*, 135 Nev. 463, 468, 454 P.3d 709,

715–16 (2019). Martin, relying on *Valentine*, argues the State did not provide sufficient evidence that Mrs. Newton had a possessory interest because the stolen pens belonged to Mr. Newton.

In *Valentine*, we held that a defendant had not committed robbery against the wife when the husband handed the defendant $100 from his wallet because the State presented no evidence that the wife had the right to possess the money in her husband's wallet. *Id.* at 468, 454 P.3d at 716. We specifically rejected the argument that the mere fact the parties were married—which could mean that the property was community property—was sufficient to demonstrate that the wife had a possessory interest in the money taken from the husband. *Id.* at 468 n.7, 454 P.3d at 716 n.7.

We conclude this case is distinguishable from *Valentine* because unlike the defendant in *Valentine*, who took money from the husband's person, here the pens were taken from the house and bedroom where Mrs. Newton lived—a place where she had a right to possess and retain property. The fact Mr. Newton owned the pens does not preclude a rational juror from finding that Mrs. Newton had the right to possess the pens. Therefore, viewing the evidence in the light most favorable to the State, a rational juror could have reasonably concluded that Mrs. Newton had a possessory interest in the stolen pens.

Second, with respect to the third element, the presence requirement, "[w]e have adopted a broad definition of 'presence' with respect to robbery." *Guy v. State*, 108 Nev. 770, 775, 839 P.2d 578, 581 (1992). The presence requirement is satisfied not only when the person is physically present during the taking, but also when the victim is so overcome by violence or fear that they are prevented from retaining possession of the property. *Id.* at 775, 839 P.2d at 582.

Applying our broad definition of "presence," Mrs. Newton testified that she was placed in fear when two men, one alleged to be Martin, confronted her outside of the house and beat her dogs before ultimately escaping. A rational juror could have found Mrs. Newton was prevented by fear from retaining possession of the pens. Therefore, we conclude that there was sufficient evidence that the stolen pens were taken from Mrs. Newton's presence.

Finally, we reject Martin's last two contentions—that neither the force nor deadly weapon enhancement were sufficiently proven. Mrs. Newton testified that Martin, or his coconspirator, upon exiting the house, approached her with a long metallic object raised in his hand and proceeded to strike the family's dogs, severely injuring them. A rational juror could have found that this evidence was sufficient to satisfy both elements.

In conclusion, we conclude Martin's robbery conviction was supported by sufficient evidence.

[FN 3] We also reviewed Martin's other sufficiency of the evidence challenges and conclude that each of the convictions are supported by sufficient evidence. With respect to Martin's challenge regarding proof of conspiracy or aiding and abetting, we conclude that there is sufficient evidence to support the State's alternative theory for criminal liability—that Martin directly committed each of the crimes of which he was convicted. Therefore, we conclude all of Martin's convictions are supported by sufficient evidence.

(ECF No. 17-13 at 3–6.)

### 3.      Ground 3(a)—Robbery with a Deadly Weapon

Martin was convicted of robbing Kathleen by taking Wayne's pens in her presence "by means of force or violence, or fear of injury to, and without the consent and against" her will, with the use of a deadly weapon (a crowbar) in violation of NRS § 200.380. (ECF Nos. 15-18 at 2, 6; 15-34.) The State alleged Martin robbed Kathleen based on either of the following theories of criminal liability: (1) by directly performing such acts; and/or (2) by acting pursuant to a conspiracy with another in performing such acts; and/or (3) by aiding and abetting another by counseling, encouraging, inducing, or otherwise procuring each other to commit such acts. (*Id.*)

At the relevant time, robbery in Nevada was defined as follows:

> 1. Robbery is the unlawful taking of personal property from the person of another, or in the person's presence, against his or her will, by means of force or violence or fear of injury, immediate or future, to his or her person or property, or the person or property of a member of his or her family, or of anyone in his or her company at the time of the robbery. A taking is by means of force or fear if force or fear is used to:

> (a) Obtain or retain possession of the property;

> (b) Prevent or overcome resistance to the taking; or

> (c) Facilitate escape.

> The degree of force used is immaterial if it is used to compel acquiescence to the taking of or escaping with the property. A taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.

NRS § 200.380, *as amended by* Laws 1995, p. 1187. The Supreme Court of Nevada has held that the State must show the victim had possession of, or a possessory, but not necessarily ownership, interest in the property taken. *Valentine v. State*, 135 Nev. 463, 468 n.7, 454 P.3d 709, 715–16 n.7 (2019) (citation omitted) (noting for sufficiency of the evidence for robbery, marriage, without more, does not establish a possessory interest in property in the possession of a spouse even under community property principles) (citing NRS § 47.230(3)). The Supreme Court of Nevada has "adopted a broad definition of 'presence' with respect to robbery, stating that '[a] thing is in the presence of a person, in respect to robbery, which is so within his reach, inspection, observation

or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.'" *Guy v. State*, 108 Nev. 770, 775, 839 P.2d 578, 581–82 (1992) (citations omitted).

A "deadly weapon" is defined, in relevant part, as "[a]ny instrument which, if used in the ordinary manner contemplated by its design and construction, will or is likely to cause substantial bodily harm or death," or "[a]ny weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death." NRS § 193.165(6). "Nevada law does not distinguish between an aider and abettor to a crime and an actual perpetrator of a crime: both are equally culpable" provided the aider or abettor "knowingly aided the other person with the intent that the other person" commit the charged crime. *Sharma v. State*, 118 Nev. 648, 654, 56 P.3d 868, 871–72 (2002). Robbery is a general intent crime although conspiracy to commit robbery is a specific intent crime. *Nelson v. State*, 123 Nev. 534, 549, 170 P.3d 517, 527 (2007).

The Supreme Court of Nevada's determination that the State presented sufficient evidence to support the jury's conviction for robbery with use of a deadly weapon of Kathleen is objectively reasonable. A rational jury could infer Kathleen had a possessory interest in the pens because, although Wayne owned the pens, they were stolen from the master bedroom suite shared by Kathleen and Wayne. A rational jury could infer Martin took the pens in Kathleen's "presence" under Nevada's broad definition of "presence." A rational jury could conclude Martin directly took the pens by "means of force or violence, or fear of injury to, and without the consent and against" Kathleen's will with the use of a deadly weapon, i.e., the crowbar, to facilitate escape. Kathleen testified she became fearful when the burglars exited her home and ran toward her with a duffle bag and a long silver item "held up" and commenced beating her dogs in her presence as the robbers attempted to escape. A rational jury could conclude the blue crowbar was the deadly weapon according to Nevada's definition as Martin hit one of the dogs such that it needed veterinary care. Wayne testified to Kathleen's fear as he heard her screaming for help and found her in "hysterics" and crying and she told Wayne to shoot the robbers. Officer Garcia, who arrived 3 minutes after Kathleen called the police, testified Kathleen was too fearful to exit her vehicle and had difficulty speaking to him. It was moreover reasonable to conclude a rational jury could

find Martin directly committed the crime by concluding Martin was the taller of the two burglars, based on the surveillance video depicting the burglars during the first and second burglaries and the attempted burglary at the neighbor's home, the video of Martin at the coin and jewelry store, and Kathleen's testimony that, similar to one of the burglars in the videos on the night of the first burglary, the taller burglar wore a red bandanna over his face. Although Kathleen's testimony and various statements to police were inconsistent regarding whether she was directly threatened with the crowbar and her estimate of the race of the perpetrators, she consistently stated the burglars ran toward her holding "up" items that the burglars used to beat her dogs to facilitate their escape, and there was abundant testimony that she feared for her safety. As stated above, a court presumes the jury resolved any conflicts in the evidence in favor of the prosecution and must defer to that resolution. *Jackson*, 443 U.S. at 326. For these reasons, the Supreme Court of Nevada's determination is neither contrary to nor constitutes an unreasonable applicable of Federal law, as determined by the Supreme Court, and as it not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. Thus, Martin is not entitled to federal habeas relief for Ground 3(a).

### 4.      Ground 3(b)—Cruelty to Animals

Martin was convicted of cruelty to animals in violation of NRS § 574.100(1)(a). (ECF Nos. 15-18 at 2, 6; 15-34). According to NRS § 574.100(1) a person shall not "[t]orture or unjustifiably maim, mutilate or kill an animal kept for companionship or pleasure, whether belonging to the person or to another; or any cat or dog." "'Torture' or 'cruelty' includes every act, omission or neglect, whereby unjustifiable physical pain, suffering or death is caused or permitted." NRS § 574.050(4), *as amended by* Laws 2011, c. 284, § 2. The Supreme Court of Nevada's determination that the State presented sufficient evidence to prove Martin is directly responsible for animal cruelty is objectively reasonable. *See supra* at pp. 27–28. Kathleen's testimony and the video surveillance provided sufficient evidence from which a jury could rationally conclude Martin was the taller burglar who hit the older dog with the crowbar. Moreover Wayne testified the beating caused the dog to require medication and place her viability in question. Accordingly, the state supreme court's determination that were was sufficient evidence to convict Martin of directly

committing cruelty to an animal is neither contrary to nor constituted an unreasonable application of Federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. Martin is thus not entitled to federal habeas relief for Ground 3(b).

### 5.    Ground 3(c)—Possession of a Firearm by a Prohibited Person

Martin was convicted of ownership or possession of a firearm by a prohibited person in violation of NRS § 202.360, based on his possession and/or custody or control of a .22 revolver taken from the Newton residence during the first burglary, after having been convicted of three felonies in Nevada (two in 2016 and one in 2018). (ECF Nos. 15-18 at 7; 15-24 at 2, 7; 15-34.) At the relevant time, a person was prohibited from owning or having in his or her possession or under his or her custody and control a firearm if that person had "been convicted of a felony" in Nevada "unless the person has received a pardon and the pardon does not restrict his or her right to bear arms." NRS § 202.360(1)(b), *as amended by* Laws 2017, c. 490, § 7, eff. Oct. 1, 2017. "'Firearm' include[d] any firearm that is loaded or unloaded and operable or inoperable." NRS § 202.360(3)(b), *as amended by* Laws 2017, c. 490, § 7, eff. Oct. 1, 2017. The Supreme Court of Nevada's determination that there is sufficient evidence that Martin directly possessed a firearm while he was prohibited from doing so is objectively reasonable. *See supra* at pp. 27–28. Wayne testified the burglars stole a silver revolver from his closet during the first burglary. G.D. testified Martin told him he stole a revolver from Wayne and showed him a gray revolver during June of 2018. At the bifurcated trial, the State presented certified copies of three prior judgments for felony convictions Martin suffered in Nevada in 2016 and 2018. (ECF No. 15-26 at 15, 20–21.) The Supreme Court of Nevada's determination is neither contrary to nor constitutes an unreasonable application of clearly established Federal law, as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. Martin is not entitled to federal habeas relief for Ground 3(c).

### 6.    Ground 3(d)—Burglary of Nevada Coin and Jewelry

Martin was convicted of burglary of Nevada Coin and Jewelry by entering the building located by that establishment with intent to obtain money under false pretenses. (ECF Nos. 15-18

at 6; 15-34). At the relevant time, NRS § 205.060(1) stated in relevant part, "a person who, by day or night, enters any . . . room . . . shop, warehouse, store . . . or other building . . . with the intent to commit grand or petit larceny, assault or battery on any person or any felony, or to obtain money or property by false pretenses, is guilty of burglary." NRS § 205.060(1), *as amended by* Laws 2013, c. 488, § 1. "A false pretense may be defined as a representation of some fact or circumstance which is not true and is calculated to mislead." *Bright v. Sheriff, Washoe Cnty.*, 90 Nev. 168, 170, 521 P.2d 371, 373 (1974). "The representation may be implied from conduct, or may consist of concealment or non-disclosure where there is a duty to speak" and "[m]ay be made either expressly, or by implication." *Id.* The Supreme Court of Nevada's determination that the State presented sufficient evidence for a rational jury to find Martin committed burglary by directly entering the Nevada Coin and Jewelry store with the intent to obtain money under false pretenses is objectively reasonable. The store's video surveillance depicted Martin selling the Newtons' stolen jewelry and watches. The store employee identified Martin as the man who sold him the items. Martin's signature affirmed he had the right to sell the items even though they were stolen from the Newton residence, and he received $350 for the items. This, together with the testimony of G.B, video surveillance tying Martin to the crimes, and testimony that some of the other property stolen from the Newton residence was located in Martin's bedroom, provided sufficient evidence for a rational jury to infer Martin knew the items were stolen, and falsely represented that he had the right to sell the items, to obtain money. Accordingly, Martin is not entitled to federal habeas relief for Ground 3(d).

### 7.    Ground 3(e)—Attempted Burglary of Bayramoglu residence

Martin was convicted of attempted burglary of the Bayramoglu residence. (ECF Nos. 15-18; 15-34.) At the relevant time, "[a]n act done with the intent to commit a crime, and tending but failing to accomplish it, is an attempt to commit that crime." NRS § 193.330(1). "The elements of an attempt to commit a crime in [Nevada] are: (1) an intent to commit a crime, (2) performance of some act toward its commission, and (3) failure to consummate its commission." *Beddow v. State*, 93 Nev. 619, 622, 572 P.2d 526, 528 (1977) (citation omitted). To be convicted of an attempt to commit a crime in Nevada, the State must show, among other things, that the accused committed

an act with the intent to commit that crime. *Sharma,* 118 Nev. at 654, 56 P.3d at 872. The Supreme Court of Nevada's determination that there was sufficient evidence to convict Martin for directly committing the crime of attempted burglary of the Bayramoglu residence is objectively reasonable. A rational jury could infer Martin specifically intended to enter the Bayramoglu's residence to commit a larceny and that he committed acts to do so but failed based on the testimony that two individuals covered up the camera at the back door of that residence, the individuals appeared to be the same or similar to those who burglarized the nearby Newton residence that same night, one of those individuals was identified as Martin, and there were marks on the door of the residence. Martin is therefore not entitled to federal habeas relief for Ground 3(e).

### 8. Ground 3(f)—Aiding and Abetting Theories[15]

Martin claims there is insufficient evidence to support all 12 of his convictions based on an aiding and abetting theory of liability. *See supra* at p. 25 n.14. The Supreme Court of Nevada rejected this claim because it concluded "[t]here is sufficient evidence to support the State's alternative theory for criminal liability—that Martin directly committed each of the crimes of which he was convicted." *See supra* at p. 27. As discussed above, the State presented sufficient evidence for the jury to find Martin directly committed the crimes of (1) robbery of Kathleen with the use of a deadly weapon; (2) cruelty to animals; (3) ownership/possession of a firearm by a prohibited person; (4) burglary of Nevada Coin and Jewelry; and (5) attempted burglary of the Bayramoglu residence. As discussed below, the Supreme Court of Nevada's determination that the State presented sufficient evidence for a rational jury to find Martin directly committed the remainder of Martin's convictions is neither contrary to nor constitutes an unreasonable application of Federal law, as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. Thus, Martin is not entitled to federal habeas relief for Ground 3(f).

### a. Ground 3(f)(1)—Home Invasion

Martin was convicted of two counts of invasion of the Newton residence on the nights of

---

[15] The Court subdivides 3(f) for clarity.

the two burglaries. (ECF Nos. 15-18; 15-34.) At the relevant time, a person was guilty of invasion of the home, if they "[b]y day or night, forcibly enter[ed] an inhabited dwelling without permission of the owner, resident or lawful occupant, whether or not a person is present at the time of the entry." NRS § 205.067(1), *as amended by* Laws 1995, p. 1215. The offense of home invasion does not necessitate the showing of entry with a specific intent to commit a crime; rather, a defendant is guilty of home invasion if the defendant commits a forcible entry of an inhabited dwelling without permission of the owner, resident, or lawful occupant. *Servin v. State*,117 Nev. 775, 789, 23 P.3d 1277, 1287 (2001). The Supreme Court of Nevada's determination that there is sufficient evidence for a rational jury to conclude that Martin directly committed invasion of the Newton residence on the occasions of both burglaries in June of 2018 is objectively reasonable. Testimony and evidence demonstrated the invaders broken a glass door on the first occasion, broke a window next to the front door to gain entry on the second occasion, broke down the master bedroom door on each occasion, and did this without permission to enter the residence. A rational jury could infer Martin was a direct participant on each occasion when the Newton home was invaded based on the trial testimony, video surveillance, documents, and Martin's possession of items stolen during the first invasion.

### b.  Ground 3(f)(2)—Grand Larceny/Grand Larceny of a Firearm

Martin was convicted of (1) grand larceny on June 3, 2018, for taking, *inter alia*, jewelry and electronics, from the Newton residence having a value of $3,500 or greater; (2) grand larceny of the firearm taken from the Newton residence on June 3, 2018; and (3) grand larceny on June 13, 2018, for taking personal property having a value of $3,500 or greater. (ECF Nos. 15-18 at 3-5; 15-34.) A person commits grand larceny if a person "[i]ntentionally steals, takes and carries away, leads away or drives away: [p]ersonal goods or property, with a value of $650 or more, owned by another person . . . ." NRS § 205.220(1)(a), *as amended by* Laws 2011, c. 41, § 13. "A person who intentionally steals, takes and carries away a firearm owned by another person commits grand larceny of a firearm." NRS § 205.226(1). The Supreme Court of Nevada concluded reasonably that the State presented sufficient evidence for a rational jury to convict Martin of directly committed grand larceny and grand larceny of a firearm on June 3, 2018. A rational jury

could infer from the trial testimony, videos, and Martin's possession of items stolen from the Newton residence on June 3, 2018, that Martin had the requisite intent to commit a larceny, and that he directly stole personal property, including Wayne's .22 revolver, from the Newton residence on that morning. A jury could infer from Ross's testimony and documents concerning the appraised value of the stolen property taken on June 3, 2018, which Martin attempted to sell to Nevada Coin and Jewelry, had a value well over $3500, as the Corum Bubble watch was alone valued at $4,000. Although police found the revolver in the possession of Denton, a rational jury could infer Martin took Wayne's revolver during the first burglary based on G.B.'s testimony that he saw Martin with a revolver that generally matched the description of Wayne's stolen revolver and that Martin admitted to G.B. that he stole the firearm and property from Wayne. The Supreme Court of Nevada could also reasonably conclude there was sufficient evidence presented that Martin directly committed a grand larceny on June 13, 2018, based on the evidence supporting Martin's perpetration of the first burglary and grand larceny at the Newton property, the surveillance video from both burglaries, and testimony supporting the identification of Martin as one of the individuals involved for each burglary. A rational jury could conclude, based on the appraisal and evaluation testimony for some of the items taken during the first burglary, that items taken during the second burglary, including Wayne's diamond and ruby pens and the second Corum Bubble watch, had a value of $3,500 or more.

### c.      Ground 3(f)(3)—Burglary/Burglary with Firearm

Martin was convicted on two counts of burglary of the Newton residence and separately convicted for burglary while in possession of a firearm for entering the Newton residence during the first burglary "with the intent to commit larceny while in possession of and/or gaining possession of a firearm at any time during the commission of the crime and/or at any time before leaving the structure or upon leaving the structure . . . ." (ECF Nos. 15-18 at 3; 15-34.) *See* NRS § 205.060(1), *as amended by* Laws 2013, c. 488, § 1. The Supreme Court of Nevada concluded reasonably that a rational jury could find Martin directly committed both burglaries and burglary while in possession of a firearm. A rational jury could conclude Martin had the requisite intent to commit a larceny, that he entered the Newton residence on the occasion of the first and second

burglaries based on the testimony, video surveillance (of the Newton residence, Bayramoglu residence, and Nevada Coin and Jewelry), evidence of his possession of the items stolen from the Newton residence during the first burglary, including Wayne's revolver, and testimony and documents concerning the appraised value of the stolen items that Martin attempted to sell to Nevada Coin and Jewelry.

### D.    Ground 4(b)—Denial of Discovery of Crime Stoppers Tip Documents

Ground 4 alleges the state district court violated Martin's rights to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments by refusing to allow Martin discovery of Crime Stoppers tips in the State's possession after the state district court conducted an *in camera* review of the tips and held, they contained no exculpatory information. (ECF No. 6 at 9.) Respondents contend the claim is conclusory because Martin fails to present any facts to support his argument that the information would have allowed him to present a more favorable defense. (ECF No. 39-25 at 28.)

The defense moved pretrial to compel discovery of, among other things, Crime Stoppers Tip #194-C15556, which the defense claimed prompted the police to stop and arrest Martin. (ECF No. 39-6 at 4–5.) The defense contended the caller, Jessica Ordich, claimed her niece overheard Martin admit to Ordich's cousin that he was involved with the Newton burglaries. (*Id.*) The State opposed the motion claiming it had no access to such information. (ECF No. 14-17 at 24.) At the hearing on the motion for discovery, defense counsel argued Crime Stoppers "passes along all of its tips to Metro so that should be in Metro's possession . . . ." (ECF No. 14-19 at 4.) The prosecutor confirmed the State possessed a "single page" from Crime Stoppers that was "summarized in the report," but did not have any other tips or information about the tipster. (*Id.* at 6–7.) The state district court directed the State to disclose the tipster's identity if it possessed that information; otherwise, it directed the defense to subpoena the records from Crime Stoppers. (*Id.*)

At a subsequent hearing, defense counsel claimed the State had not disclosed any information in the possession of the police about Crime Stoppers tips related to the case and confirmed the defense did not subpoena anything from Crime Stoppers. (ECF No. 14-29 at 7, 13.) The next day, the State filed a bench brief indicating, among other things, that it need not produce

a Crime Stopper tip in discovery "unless the State determines it is material, relevant, and exculpatory, pursuant to *Brady* and its progeny."[16] (ECF No. 14-30 at 6.) The discovery of Crime Stopper tips was discussed at a subsequent hearing where the state district court directed the State to produce exculpatory "documents associated with a Crime Stopper tip in the possession of . . . the State . . . and Metro" except not "officer's opinions and emails" and reiterated the defense could subpoena Crime Stoppers records. (ECF No. 14-31 at 3, 14, 16, 22–28.)

The State subsequently represented that it provided the defense with "officers notes" describing "the two Crime Stoppers tips in this case." (ECF No. 14-33 at 3–4.) The State gave the state district court "two sheets that Metro had in their possession" "documenting the Crime Stoppers tips," and the court agreed to conduct *in camera* review of the two sheets for "exculpatory matters." (*Id.*) The state district court distributed a minute order denying the motion for discovery of the tip sheets: "Upon review of the Crime Stoppers Tip ID XXX-XXX556 and Tip ID XXX-XXX419 submitted to chambers for in camera inspection, the COURT FINDS that neither TIP ID contains exculpatory information."[17] (ECF No. 14-1 at 14, 34.) Martin's appellate counsel was denied access to the Crime Stopper tips for purposes of appellate review. (ECF No. 16-35.)

"The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). "It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citing *United States v. Agurs*, 427 U.S. 97 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "To prevail on a *Brady* claim, a defendant must prove (1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999). The Supreme Court has held, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the

---

[16] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[17] The state district court also "ORDERED that the Crime Stoppers Tips provided for in camera inspection is to be marked as an exhibit and sealed by Order of the Court." (ECF No. 14-1 at 14, 34.)

defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Ritchie*, 480 U.S. at 57 (citations omitted). In order to comply with *Brady,* "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 437 (1995).

If a defense request for *Brady* material places a prosecutor in doubt, disclosure is the rule; however, the Ninth Circuit has approved a court's use of *in camera* inspection to determine whether material must be disclosed under *Brady* and its progeny. *Cone v. Bell,* 556 U.S. 449, 470 n.15 (2009) ("[t]he prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure."); *United States v. Gardner,* 611 F.2d 770, 775 (9th Cir. 1980) ("If the prosecution is uncertain about the materiality of information within its possession, it may submit the information to the trial court for an In camera inspection and evaluation.").

The Supreme Court of Nevada conducted *in camera* review of the Crime Stoppers tips and determined they contained no exculpatory information and were properly sealed:

> *The Crime Stoppers tip was properly sealed*
>
> Martin challenges the district court's determination that officer notes summarizing certain Crime Stoppers tips were not exculpatory. He argues the district court improperly sealed the notes and denied his discovery request and post-trial motion to unseal the information because it deprived him of the opportunity to raise the issue adequately on appeal.
>
> "The determination of whether particular evidence is exculpatory is generally left to the discretion of the district court." *Ostman v. Eighth Judicial Dist. Court,* 107 Nev. 563, 564, 816 P.2d 458, 459 (1991). "Exculpatory evidence is defined as evidence tending to establish a criminal defendant's innocence." *State v. Huebler*, 128 Nev. 192, 200 n.5, 275 P.3d 91, 96 n.5 (2012) (alteration omitted) (internal quotation marks omitted).
>
> Upon review, the information contained in the sealed record does not tend to establish Martin's innocence. The sealed exhibit consisted of a summary of two Crime Stoppers tips possessed by the State. The State disclosed the content of one of the tips to Martin. The other tip was not pertinent to the case. Having independently reviewed the sealed exhibit, we agree with the district court that neither of these tips were exculpatory. Therefore, the district court did not abuse its discretion by sealing the Crime Stoppers tips or rejecting Martin's motion requesting to have the Crime Stopper's tip unsealed for appellate purposes.

(ECF No. 17-13 at 13–14.)

The Supreme Court of Nevada's determination is neither contrary to nor constitutes an unreasonable application of Federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. After conducting *in camera* review of the tips, this Court concludes the Supreme Court of Nevada reasonably determined tip 419 has no relevance to Martin's case. Moreover, it appears, based on the totality of the state-court record, that the substance of tip 556 was provided to the defense. The pretrial transcripts indicate defense counsel was not only aware of all of the facts contained in that tip, but counsel was also aware of the identity of the tipster, which is not included in the tip documents submitted for *in camera* review. It was also reasonable for the state supreme court to determine the failure to disclose the tips was not prejudicial as the tip documents contain nothing exculpatory or that would have provided material impeachment evidence at Martin's trial. As such, there is no basis to conclude there is a reasonable probability that disclosure of the tips would have resulted in a different outcome. Accordingly, Martin is not entitled to federal habeas relief from Ground 4.

### E.    Ground 5(a)—Search of Backpack

Ground 5(a) alleges Officer Connors unlawfully searched Martin's backpack in violation of the Fourth and Fourteenth Amendments because Martin did not consent to the search. (ECF No. 6 at 11.) Respondents contend that Martin is not entitled to federal habeas corpus relief for this claim because he had a full and fair opportunity to litigate his Fourth Amendment claim in the state courts. (ECF No. 39-25 at 30.)

During the trial testimony of Officer Connors, defense counsel viewed Connors's body camera video of Martin's arrest and objected to the State introducing any evidence from Martin's backpack on the grounds the search of the backpack violated the Fourth Amendment. (ECF No. 39-17 at 17.) The trial court permitted *voir dire* outside the presence of the jury and the State informed Connors there was an objection to the "consent search." (*Id.* at 19–20.) Connors testified she was aware of both burglaries at the Newton residence but also detained Martin based on reasonable suspicion he was contributing to the delinquency of a minor who was reported missing. (*Id.* at 21.) Connors said she had a Crime Stoppers tip that Martin was romantically involved with

tipster's minor niece, that Martin was involved in the Newton burglaries, and that included the address where Martin was located at the time of the tip. (*Id.* at 22.) Connors visited the tipster before locating Martin and stopping him with "lights and siren" as he was on foot listening to music. (*Id.* at 23–25.) She said she asked him to step in front of the patrol car and he complied. (*Id.* at 23.) Her gun was not drawn. (*Id.*) She said Martin consented to the search of his backpack where she found a bottle of cologne, however, she could not recall his exact words, whether she documented his consent, or whether his consent was depicted on her body camera, but she said it "was a clear statement that I could do it, that I could check the backpack." (*Id.* at 22–28.) Martin testified Connors did not ask for, and he did not give, consent for Connors to search his backpack. (*Id.* at 32–33.) He testified, "She told me to take my backpack off and set it on the vehicle. I did that. She grabbed the backpack. She didn't tell me she was going to search. She grabbed it and looked in it, and then starting asking me questions . . . . she let me go." (*Id.* at 33–34.)

Defense counsel argued the State failed to meet its burden to show the search of the backpack was consensual, pointing out, among other things, Connors nowhere documented the consent, did not have her body camera activated at the time, did not recall Martin's exact language of consent, and this was the first-time counsel learned the search was consensual. (*Id.* at 29–31, 36–37.) The State argued it established consent by a preponderance of the evidence, and although the testimony was in conflict, there was no reason to doubt Connors's testimony and Martin "had a lot riding on whether this picture of the cologne comes in." (*Id.* at 34–35.) The trial court ruled the State proved by a preponderance of the evidence that there was consent. (*Id.* at 46–47.)

The Nevada Supreme Court considered the Fourth Amendment claim and rejected it during Martin's direct appeal:

> Martin challenges the district court's decision to allow the State to introduce photographs taken of the inside of his backpack—that showed stolen property belonging to the Newtons—after he was stopped by a police officer. Martin was stopped when an officer was investigating a Crime Stopper's tip that stated Martin was contributing to the delinquency of a minor and was connected to the Newton home invasions.
>
> We review the denial of a motion to suppress as a mixed question of law and fact. *State v. Lisenbee*, 116 Nev. 1124, 1127, 13 P.3d 947, 949 (2000). "This court reviews findings of historical facts under the clearly erroneous standard, but the legal consequences of those facts are questions of law which we review de

novo." *Id.* Thus, we review the district court's legal conclusion—that the officer had reasonable suspicion to stop Martin—de novo and its factual findings—that Martin consented—under a clearly erroneous standard.

"[P]olice officers may temporarily detain a suspect when officers have reasonable articulable suspicion that the suspect has committed, is committing or is about to commit a crime." *Somee v. State*, 124 Nev. 434, 442, 187 P.3d 152, 158 (2008) (internal quotation marks omitted). "An anonymous tip can provide reasonable suspicion to justify an investigatory stop if it exhibits sufficient indicia of reliability and is suitably corroborated." *McMorran v. State*, 118 Nev. 379, 387, 46 P.3d 81, 86 (2002). Whether reasonable suspicion exists is determined based on the totality of the circumstances. *Somee*, 124 Nev. at 442, 187 P.3d at 158. Totality of the circumstances requires evaluating both the quantity and quality of information possessed by the police. *See Alabama v. White*, 496 U.S. 325, 330 (1990).

Considering the totality of the circumstances, we conclude the officer had sufficient reasonable suspicion to stop Martin. The officer testified that she possessed a tip stating Martin was involved in the Newton home invasion and that he was also contributing to the delinquency of a missing minor.

[FN 4] We reject Martin's argument that he was prejudiced in arguing his motion to suppress by not having access to the sealed officer notes regarding two Crime Stopper tips. It was the officer's testimony regarding the tip and not the actual tips that formed the basis for the district court's decision to admit the photographs. Martin had the opportunity to and did cross-examine the officer regarding the contents of the tip. Thus, we conclude Martin was not prejudiced simply because he did not have access to the physical document.

She testified that the tip listed the address where both the minor and Martin could be located. The officer went to the address and corroborated that both Martin and the minor had recently been at the residence. Although the officer was told the missing minor was not with Martin, the fact that the minor was still missing, that Martin was alleged to be connected with her, and that he also was connected to the Newton home invasions was sufficient to create reasonable suspicion to stop Martin.

We conclude that the district court's finding that Martin consented to the search of his backpack was not clearly erroneous because the district court heard testimony that Martin affirmatively provided the officer consent prior to searching his backpack.

[FN 5] Martin argues that the officer's testimony regarding his consent was not credible. We reject Martin's argument. The district court found the officer's testimony credible. Credibility determinations are left to the district court and, absent a mistake, we will not reweigh credibility on appeal. *See State v. Rincon*, 122 Nev. 1170, 1177, 147 P.3d 233, 238 (2006).

In sum, we conclude the district court did not violate Martin's Fourth Amendment rights by denying his oral motion to suppress by admitting the photographs of the inside of his backpack.

(ECF No. 17-3 at 6–8.)

Federal courts may not consider a petitioner's Fourth Amendment claims alleging illegal search or seizure "where the State has provided an opportunity for full and fair litigation of a Fourth amendment claim." *Stone v. Powell*, 428 U.S. 465, 481 (1976). The *Stone* doctrine applies "whether or not the claims were actually adjudicated on the merits and whether or not they involved an unreasonable application of Supreme Court law or unreasonable determination of the facts." *Newman v. Wengler*, 790 F.3d 876, 878 (9th Cir. 2015). "The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided." *Id.* at 880 (quoting *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996)); "All *Stone v. Powell* requires is the initial opportunity for a fair hearing. Such an opportunity for a fair hearing forecloses this court's inquiry, upon habeas corpus petition, into the trial court's subsequent course of action, including whether or not the trial court has made express findings of fact." *Id.* at 881 (quoting *Caldwell v. Cupp*, 781 F.2d 714, 714 (9th Cir. 1986)).

According to the state-court record, Martin was given a full and fair opportunity to litigate his Fourth Amendment claim before the state courts. Martin alleges he did not consent to the search of his backpack and that the collection of the photograph of cologne found in his backpack violated his right to be free from unreasonable searches and seizures. Martin moved to suppress the evidence during trial, relying on the Fourth Amendment. The trial court held a hearing, entertained testimony from Martin and the officer who searched his backpack. Martin also raised his Fourth Amendment claim on direct appeal to the Supreme Court. The Supreme Court of Nevada affirmed the trial court's ruling. Thus, Martin had the opportunity to fully and fairly litigate the Fourth Amendment claim that he now presents in his federal habeas petition, and this Court is precluded from reviewing that claim. Martin has no entitlement to federal habeas relief for Ground 5(a).

## IV.   CERTIFICATE OF APPEALABILITY

This is a final order adverse to Martin. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a COA. This Court therefore has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying this standard, a certificate of appealability is not warranted for Grounds 1, 2(a)(1), 3, 4(b), and 5(a) as reasonable jurists would not find the Court's assessment debatable or wrong. See Slack, 529 U.S. at 484. A COA is also denied for all other grounds as jurists of reason would not find it debatable or wrong whether the Court is correct in its procedural rulings dismissing Grounds 2(a)(2), 2(a)(3), 2(c), 4(d) and 4(e), and the portions of Grounds 1, 2 and 4 that allege equal protection violations, as conclusory or whether the Court is correct in its procedural rulings dismissing Grounds 4(a), 4(c), and 5(B) as unexhausted. (ECF No. 25 at 11; 26; 27.)

## V. CONCLUSION

**IT IS THEREFORE ORDERED:**

1. Grounds 1, 2(a)(1), 3, 4(b) and 5(a) are DENIED on the merits; Grounds 2(a)(2) and 2(a)(3) are DISMISSED with prejudice as procedurally defaulted; and the Petition (ECF No. 6) is DENIED with prejudice.

2. A certificate of appealability is DENIED.

3. All requests for an evidentiary hearing are DENIED.

4. The motion for an enlargement of the time (ECF No. 41) to submit documents for *in camera* inspection in compliance with the Court's order (ECF No. 40) is GRANTED *nunc pro tunc*. The documents submitted (ECF No. 42) are deemed timely submitted. Martin's request for sanctions for the delay in submitting the documents for *in camera* inspection (ECF No. 43) is DENIED.

5. The Clerk of Court is directed to substitute W.A. Gittere for Respondent William Reubart; and

6. The Clerk of the Court is directed to enter judgment accordingly and close this case.

DATED this 8th day of May, 2023.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE